# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CARPET SERVICE           )
INTERNATIONAL, INC. and    )
CARMINE MOLFESE,        )
                         )
    Plaintiffs,            )
                         )    **No. 09 C 1083**
v.                       )
                         )    **Magistrate Judge Geraldine Soat Brown**
                         )
CHICAGO REGIONAL COUNCIL OF )
CARPENTERS, UNITED      )
BROTHERHOOD OF CARPENTERS  )
AND JOINERS OF AMERICA LOCAL )
UNION NO. 13, and PATRICK RYAN, )
                         )
    Defendants.           )

## MEMORANDUM OPINION AND ORDER

Plaintiff Carpet Service International, Inc., brought a claim against defendants Chicago Regional Council of Carpenters and United Brotherhood of Carpenters and Joiners of America Local Union No. 13 under the Labor Management Relations Act, 29 U.S.C. § 187. (Compl.) [Dkt 1.] Plaintiff Carmine Molfese individually brought state law claims of assault, battery, and intentional infliction of emotional distress ("IIED") against the two union defendants and defendant Patrick Ryan. (*Id*.)

The parties have consented to magistrate judge jurisdiction. [Dkt 102.] A bench trial was conducted on January 18, 19, 20, and 24, 2011.[1] [Dkt 106-09.] The parties submitted written post-

-----

[1] References to the trial transcript are cited herein as "Tr.___."

trial proposed findings of fact and conclusions of law.  [Dkt 117, 119, 120, 124.]  The court has

carefully considered the testimony of the witnesses, the exhibits introduced into evidence, and the

written submissions of the parties.  The following constitutes the court's findings of fact and

conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  To the extent certain findings

may be deemed conclusions of law, they shall also be considered conclusions.  Similarly, to the

extent matters contained in the conclusions of law may be deemed findings of fact, they shall also

be considered findings.  *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).  For the reasons set forth

below, the court finds in favor of defendants on all counts.[2]


## I.    <u>Findings of Fact</u>

### A.    Background

<u>The parties</u>

Plaintiff Carpet Service International, Inc. ("CSI"), is an Illinois corporation that sells and

installs flooring.  (Tr. 206-07.)  In the summer of 2008, CSI had 14 employees.  (Tr. 219.)  Plaintiff

Carmine Molfese ("Molfese") is the president of CSI, a company he started more than twenty years

ago. (Tr. 204.)  Pietro Molfese, Molfese's cousin, has been employed by CSI as a laborer for the past

twenty years, since coming to the United States.  (Tr. 156, 158, 184.)  Sor (or Sori) Ray is Molfese's

assistant, and works at CSI's offices in Addison, Illinois.  (Tr. 219, 472.)  Molfese, Pietro Molfese,

and Ms. Ray all testified at the trial.

Defendants Chicago Regional Council of Carpenters ("Chicago Regional Council") and

---

[2]  At the close of plaintiffs' case, both plaintiffs and defendants brought Rule 52(c) motions for judgment as a matter of law.  Plaintiffs' motion was denied.  (Tr. 542-43.)  In light of this decision, defendants' motion is moot.

Carpenters Local Union No. 13 ("Local 13") are both "labor organizations" within the meaning of the National Labor Relations Act, 29 U.S.C. § 152(5). (Ans. ¶¶ 51, 53.) [Dkt 9.] The Chicago Regional Council's jurisdiction covers 81 counties in Illinois, Wisconsin, and Iowa. (Tr. 562-63.) Local 13 is affiliated with the Chicago Regional Council, which has been paying Local 13's officers' salaries since January 2000. (Tr. 13, 31.) Local 13's jurisdiction encompasses an area within the city of Chicago bounded by Roosevelt Road on the south, Addison Street on the north, Pulaski Street on the west and the lakefront on the east. (Tr. 597, 675.) At the time of trial, defendant Patrick Ryan ("Ryan") had been a union organizer for Local 13 for approximately five and a half years. (Tr. 654.) Michael Sexton served as the President and Business Manager of Local 13 from April 1995 through July 2010. (Tr. 11, 634.) Edmund (Ed) Sexton, Michael Sexton's son, had been a business representative for Local 13 for five and a half years at the time of trial. (Tr. 595, 597-98.) Michael Sexton, Ed Sexton, and Ryan all testified at the trial.

Plaintiffs' complaint initially also named Local Union No. 1185 of the United Brotherhood of Carpenters and Joiners ("Local 1185") as a defendant. (*See* Compl.) Local 1185 is a local union covering a specialty craft (floor covering) with a jurisdiction encompassing the 81 counties within the Chicago Regional Council. (Tr. 561-62.) Plaintiffs voluntarily dismissed Local 1185 as a defendant in this case in 2009. [Dkt 21.]


Procedural history

After denying defendants' motion for summary judgment, the District Judge to whom this case was previously assigned set it for a bench trial. [Dkt 54, 59, 62.] He also granted two motions *in limine* brought by defendants. First, the District Judge granted defendants' motion to bar the

testimony of Esther Molfese, Molfese's wife. [Dkt 73, 99.] Second, he granted defendants' motion

to bar plaintiffs from presenting any testimony under Federal Rule of Evidence 702 because plaintiffs

had not served any disclosures under Federal Rule of Civil Procedure 26(a)(2). [Dkt 77, 95.] *See*

*Meyers v. Natl. R.R. Passenger Corp*, 619 F.3d 729, 734-35 (7th Cir. 2010); *Musser v. Gentiva*

*Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). The District Judge ruled that one of Molfese's

physicians, Dr. Gerald Maida, could testify about instructions he gave Molfese, as agreed by

defendants, but could not testify to anything that would constitute Rule 702 testimony. (Tr. Oct. 21,

2010 at 4.) [Dkt 110.] The District Judge denied without prejudice defendants' motion to bar

testimony by Ms. Ray. (*Id*. at 6.) He stated that she could not testify as an expert, but that to the

extent she would be "simply reciting from the books and records and drawing some conclusions

from that that I could draw as the finder of fact," her testimony would be allowed. (*Id*.) After the

case was reassigned to this court, those rulings were enforced at the trial.


Plaintiffs' claims

CSI claims damages under Section 303 of the Labor Management Relations Act ("LMRA"),

29 U.S.C. § 187. (Compl. ¶ 7.) That section provides a private right of action for anyone injured

in his business or property by a labor organization engaged in an "unfair labor practice" as defined

in § 158(b)(4). The latter section provides that it is an "unfair labor practice" for a labor organization

or its agents to "threaten, coerce, or restrain any person engaged in commerce or in an industry

affecting commerce," with the object of "forcing or requiring any person . . . to cease doing business

with any other person . . . *Provided*, [t]hat nothing in this clause . . . shall be construed to make

unlawful, where not otherwise unlawful, any primary strike or primary picketing." 29 U.S.C. §

158(b)(4)(ii). In this case, CSI claims that in the summer of 2008, Local 13 had a dispute with CSI (the primary employer), and engaged in unlawful secondary activity against a secondary employer, Sunrise Construction Group, Inc., with whom CSI had a contract.

In his individual claims, Molfese alleges that on August 19, 2008, during a confrontation near the worksite, Ryan struck Molfese with his knee on the Molfese's left side, knowing that Molfese had undergone open heart surgery a few months earlier, and threatened to give him another heart attack. (Compl. ¶¶ 3, 86-88.)

### B. Evidence presented at trial

Plaintiffs' presentation of evidence at the trial was difficult to follow for a number of reasons. To start, CSI's claim is complicated by the fact that the events that CSI now alleges constitute Local 13's unlawful secondary activity were bracketed by two other labor disputes in the summer of 2008 which are not the subject of this case, as will be explained further below. The testimony of plaintiffs' witnesses at times did not make a clear distinction among the various disputes. Additionally, the testimony of plaintiffs' witnesses was confusing and sometimes contradictory. The credibility and reliability of plaintiffs' witnesses' testimony was also significantly undermined by plaintiffs' counsel's leading questions in the direct examination of those witnesses on contested substantive issues. That raised questions about whether the witness was testifying from his own recollection or from the prompting of plaintiffs' counsel. *See U.S. v. Durham*, 645 F.3d 883, 891 (7th Cir. 2011) (collecting cases which caution that leading questions may plant a false memory and inhibit the jury's ability to make credibility determinations). Plaintiffs' counsel also interjected statements about the evidence as witnesses were being examined. (*See, e.g.*, Tr. 123, 226-27, 391-

92, 532-33, 731-32, 752-53, 759-60.)[3]  Plaintiffs' counsel persisted in that behavior even after repeated objections by defendants' counsel and admonishments from the court.  (*See, e.g.*, Tr. 135-136, 227, 424-425, 518-19, 532-33.)

Molfese's credibility was substantially undercut by his own inconsistent testimony, the inconsistency between his present testimony and his deposition testimony taken in 2009, and his demeanor during testimony, including patent exaggerations.  By the end of his testimony, he and his own counsel were arguing about particular points in his testimony.  (See, e.g. Tr. 421-24.)[4]

Those are some of the factors that the court considered in deciding whether the plaintiffs carried their burden of proving disputed questions of fact.

---

[3]  For example:

| Defendants' counsel: | And wasn't Carpet Service International engaged in a labor dispute with the carpenters union in January of 2009? |
|---|---|
| Witness (Ms. Ray): | I don't know if they were. |
| Plaintiffs' counsel: | Objection. |
| Defendants' counsel: | You do not know? |
| Witness: | No. |
| Plaintiffs' counsel: | Objection. |
| The court: | He's asked her.  She doesn't know. |
| Plaintiffs' counsel: | But the objection is that's not the reason they lost the job. |

(Tr. 531-32.)

[4]  That led to some unusual direct examination, for example:

| Molfese: | It was on the 24th [of July].  24, 25, I don't remember the exact date. |
|---|---|
| Plaintiffs' counsel: | But you swore to Mr. what's his name, my co-counsel. |
| Molfese: | Then it was on the 24th. |
| Plaintiffs' counsel: | Just because you swore doesn't mean it had to be the 24th. |

(Tr. 422.)

<u>CSI's contract to perform work at 24 S. Morgan</u>

On September 25, 2007, CSI entered into a subcontractor agreement with Sunrise Construction Group, the general contractor of a mid-rise condominium building being built at 24 S. Morgan in Chicago, Illinois. (Pls.' Exs. 2, 3; Tr. 635.) CSI was to install carpets, countertops, and floor and wall tiles in the building units. (Pls.' Exs. 2, 3; Tr. 85-86.) The total contract amount for materials and labor was $586,670.64. (Pls.' Ex. 3; Tr. 87.) In the summer of 2008, CSI had four employees working at the 24 S. Morgan site. (Tr. 217-18.)

The program (that is, construction) manager of the 24 S. Morgan job site was Ross Ferraro, Jr., who was employed by Karpedium, Inc. (Tr. 77-78.) Mr. Ferraro's responsibilities included overseeing the day-to-day operations at the job site, scheduling, managing costs, and communicating with the city. (*Id*.) Karpedium maintained offices from which Mr. Ferraro worked at 1000 W. Monroe, which is around the corner from the 24 S. Morgan building. (Tr. 54, 78.) Robert Cruz, also a Karpedium employee, was the superintendent of the job site in the summer and fall of 2008. (Tr. 130.) Mr. Ferraro and Mr. Cruz testified at the trial.

<u>Local 13's presence at the 24 S. Morgan job site</u>

The 24 S. Morgan site is located within Local 13's geographical jurisdiction. (Tr. 597, 675.) When the building project began in the spring of 2007, agents of Local 13 became interested in the site because they believed carpenters would be working there. (Tr. 597-98, 635-36, 654-55.) Michael Sexton, Ed Sexton, and Ryan visited the site in spring 2007 to make contact with the general contractor and find out who would be pouring the foundation. (Tr. 598, 635-36, 654-55.) As the job progressed, Local 13 continued to monitor the site because two companies working there,

Concrete Structures and Welch Drywall, had contracts with the Chicago Regional Council. (Tr. 599-600, 659.) Agents of Local 13 periodically visited the site to speak with their members and to "make sure everything was going okay." (Tr. 600-01.)

The first labor dispute: Local 13's picket against "Sunrise Equities"

Sometime before June 6, 2008, Local 13 received complaints from workers at the 24 S. Morgan site that "Sunrise Equities" had non-unionized laborers performing carpentry work there. (Tr. 601-02.)[5]   The company allegedly providing the non-union labor was Bobak Construction, apparently unrelated to CSI. (Tr. 79.) Michael Sexton obtained permission from the Chicago Regional Council to conduct a recognitional picket against Sunrise Equities for the purpose of obtaining a union contract, which took place at the 24 S. Morgan job site beginning on or about June 6, 2008 and lasted approximately one week. (Tr. 27, 80, 602.) Rather than carrying picket signs on a stick, the picketers from Local 13 wore vests over their clothing that read across the front: "Chicago Regional Council of Carpenters Local No. 13 ON STRIKE Against Sunrise Equities Inc. for a Contract." (Tr. 31-32, 34; Pls.' Ex. 6, pp. 1.)

The picketing against "Sunrise Equities" was disruptive to the 24 S. Morgan work site, and Mr. Ferraro testified that it "shut down" the project for about ten days because some of the laborers refused to work while the strike was going on. (Tr. 80-81.) On June 11, 2008, Mr. Ferraro filed a complaint with the National Labor Relations Board (NLRB), stating that Local 13 had "picketed

---

[5]  The connection, if any, between "Sunrise Equities" and Sunrise Construction Group was not made clear at trial. Mr. Ferraro testified that he believed "Sunrise Equities" did not exist, and that Local 13 "had the wrong name . . . ." (Tr. 80.) In any event, because the picketing against Sunrise Equities is relevant only by way of background, the question need not be resolved.

Sunrise Equities, a neutral entity that has no presence on the job site, with an object of forcing or requiring Sunrise Equities or other neutral entities to cease doing business [with] TB [presumably Bobak] Construction." (Defs.' Ex. 1.) That complaint was later withdrawn. (Defs.' Ex. 2.)

Significantly, the parties stipulated that plaintiffs are not seeking any damages for the picketing in June 2008, or any picketing prior to July 26, 2008. (Tr. 34.)

Mr. Ferraro mentioned several times in his testimony that the June 2008 strike by Local 13 delayed the project he was managing: "I literally lost, like I said, it was about nine or 10 days of work." (Tr. 82; *see also* Tr. 81, 97.) Also, he had dealt with CSI as a subcontractor for "years." (Tr. 89.) Although he, Mr. Cruz, and their employer Karpedium are not parties to this action, those are facts the court considered in weighing their testimony.

The second labor dispute: Local 13's picket against CSI

*Beginning of the picketing*

CSI was a signatory to a collective bargaining agreement with the National Allied Workers Union Local 831 ("Local 831") that is dated July 12, 2008. (Pls.' Ex. 4.) There was no evidence as to when the agreement was entered into other than the date printed on the contract. Mr. Ferraro recalled that at some time Molfese showed him the CSI's agreement with Local 831, but could not recall the date. (Tr. 88.) CSI was not a signatory to a collective bargaining agreement with any of the defendants.

In mid-July 2008, Local 13 became aware that CSI was working at the 24 S. Morgan site from Pat Noonan, a business agent or organizer for Local 1185. (Tr. 656.) At some time in late July, 2008, Ryan visited the job site along with Ed Sexton and Pat Noonan**,** and spoke with several

CSI employees, one of whom he now knows was Pietro Molfese. (Tr. 64-66, 657-59.) There were several versions of this event described at trial. Ryan testified that he went to the site with the others on or about July 23 or 24, prior to the date the second picketing started which was, by all accounts, Saturday, July 26. (Tr. 657.) He introduced himself and inquired whether the CSI employees had union cards; according to Ryan, they replied they did not and that they were not union members. (Tr. 75, 658-60.) At some point during the conversation, Mr. Cruz appeared, and Ryan told him Local 13 planned to put up a picket line because non-union workers were on the job site. (Tr. 661.) Mr. Cruz asked the CSI employees to leave that day, on Mr. Ferraro's instruction. (*Id*.) Ryan testified that he and Ed Sexton did not speak to Mr. Ferraro personally. (Tr. 66, 661.)

Pietro Molfese testified to a different version. He testified that Ryan approached him and two other CSI employees at the 24 S. Morgan site on July 28, 2008, the Monday after the Saturday the picketing had begun. (Tr. 162.) Pietro Molfese said that Ryan confronted them about whether they were unionized. (Tr. 162-64.) Pietro Molfese testified he told Ryan that they were union members and showed him his Local 831 card. (*Id.*) Pietro Molfese testified that Ryan looked at the card and said "[W]hat kind of card is this? This is a [expletive] card. This is a [expletive] union." (Tr. 164.) He said that Ryan then yanked the cord of the drill a CSI employee was using out of the wall and told them they had to leave the job site, to which Pietro Molfese responded they would not. (Tr. 164-65.) Pietro Molfese testified that Mr. Cruz, the site superintendent, later came and told the CSI employees they had to leave and that they would be moving the CSI workers to a night shift until further notice. (Tr. 166.) On cross-examination, however, his testimony wavered: his confrontation with Ryan might have been July 26, 27 or 28, "one of these dates." (Tr. 178.)

Pietro Molfese also testified that on the day of his confrontation with Ryan and every time

he was at the job site, a picketer was present carrying a sign on a stick with a picture of a big orange-red rat on it, and two other picketers were carrying signs that said "scabs." (Tr. 160.)[6] Notably, neither of the Karpedium employees who testified supported Pietro Molfese's version of the picketers. Mr. Cruz took photographs of the picketers, but none of the pictures show picketers with signs on sticks. (Pls.' Ex. 6 at 2-7; Tr. 130-32.) All of the picketers were wearing vests with the words "Chicago Regional Council of Carpenters Local 13 ON STRIKE against CSI for a contract." Likewise, Mr. Ferraro said that the vests shown in the pictures were the signs he saw the picketers wear. (Tr. 90, 123.) Neither he nor Mr. Cruz testified that they saw any signs with pictures of rats or the word "scabs." In fact, Mr. Cruz testified that the did *not* see any signs on sticks or a sign with a rat on it, although he was on the project site every day in July and August. (Tr. 155-56.) This testimony discredits Pietro Molfese's testimony: if the picketers had carried signs of the graphic nature that Pietro Molfese described, Mr. Cruz and Mr. Ferraro would presumably have remembered it, and Mr. Cruz would have photographed those signs, not the comparatively bland vests shown in the pictures he took. Similarly, neither Mr. Cruz nor Mr. Ferraro testified to witnessing or hearing any complaint by Pietro Molfese that Ryan had yanked the cord of CSI's drill out of the wall.

The court accepts Ryan's testimony that he visited the site on July 23 or 24, before the picketing began, inquired about the union status of CSI's workers, and was told that they did not belong to a union. Because Ryan believed that CSI was employing non-union workers at the job site, he obtained permission from Chicago Regional Council to picket CSI at the 24 S. Morgan location.

---

[6] Carmine Molfese also testified that the picketers carried signs on a stick, including one with a picture of a large rat on it. (Tr. 386-87.) Molfese's testimony was impeached by his May 6, 2009 deposition testimony in which he testified that that the picketers wore vests and "[t]hey don't have signs." (Tr. 385.)

(Tr. 51, 686-87.)  The picket began on Saturday, July 26, 2008 and was led by Ryan.  (Tr. 31, 568-69, 657, 685.)   The picketers were retired union members and teamsters.  (Tr. 54-55.) They submitted remuneration reports, which Ryan signed and brought back to the Chicago Regional Council, which compensated the picketers.  (Tr. 51, 61-63, 687; Pls.' Exs. 14-16).

*The picketers' activity*

For the reasons described above, the court finds that the picketers did not carry signs on sticks with pictures of rats or the word "scabs."  Rather, the picketers wore the same style of vests in the picket against CSI that were used in the picket against Sunrise Equities, which read across the front: "Chicago Regional Council of Carpenters Local No. 13 ON STRIKE Against CSI for a Contract."  (Pls.' Ex. 6 at 2-6.)  One of the Local 13 picketers was Joe Jaros who testified that it was Local 13's practice for picketers to flip the vests over to read "Observer" when CSI workers were not present at the job site.  (Tr. 577-79, 608.)  Both Mr. Ferraro and Mr. Cruz observed that the vests were at times flipped to read "Observer."  (Tr. 123-24, 150.)  Mr. Cruz testified that he believed that there may have been "a few" times when CSI was not present at the job site and the vests still bore the "on strike" language, although he did not identify any particular date and at his deposition he did not recall any such instance.  (Tr. 151.)  When turned to the "on strike" side, the vests always mentioned CSI.  (Tr. 149.)

Typically, the picketers were present at the job site three times a day, and held the picket at the north side of the building near an alley that led to a parking lot where the laborers parked.  (Tr. 53, 55-56, 73-74.)  Mr. Cruz testified that there were "a couple [of] circumstances" when he had the workers park in the parking lot, and the union picketers stopped everyone and asked who they were

and took down their license plate numbers.  (Tr. 137.)  Although Mr. Ferraro is familiar with the concept of a "reserve gate," he did not establish a reserve gate at the 24 S. Morgan job site during the picketing by Local 13.  (Tr. 112-14.)[7]  As a result of the picketing against CSI, Welch Drywall workers walked off the job site.  (Tr. 688.)    Local 13 did not picket at CSI's office in Addison, Illinois.  (Tr. 75.)

Mr. Cruz had about four conversations with Ryan during July and August 2008, which were always about Local 13.  (Tr. 151-52.)  One of the picketers told Mr. Cruz that if CSI's workers left the job site, the picketers would also leave.  (Tr. 143.)  Mr. Cruz testified that "it's fair to say" that the focus of Local 13 during July and August 2008 was on CSI.  (Tr. 152.)


*July 28 Meeting with Ross Ferraro*

On Monday, July 28, 2008, the second day of the picketing against CSI, Ryan and another man from Local 13 whom Mr. Ferraro believed to be Michael Sexton came to visit him at the Karpedium office.  (Tr. 90-91, 95.)  Mr. Cruz observed this meeting take place, but could only identify Ryan.  (Tr. 133.)  According to Mr. Ferraro, Ryan asked him why CSI was working at the job site and whether Mr. Ferraro knew if they were unionized.  (Tr. 91.)  Ryan and Michael Sexton asked Mr. Ferraro to "get rid of them," referring to CSI.  (Tr. 91-92, 94-95.)  Ryan also told Mr. Ferraro that if he used CSI on other jobs, Local 13 would set up pickets at those job sites as well.  (Tr. 94.)  Mr. Ferraro testified that he told Ryan and Michael Sexton at this meeting that CSI was a signatory to a union contract with Local 831, and showed them Local 831's website.  (Tr. 92-93.)

---

[7] *See Mautz & Oren, Inc. v. Teamsters, Chauffeurs, and Helpers Union, Local No. 279*, 882 F.2d 1117, 1122 (7th Cir. 1989), for a discussion of the use of reserve gates at work sites where the primary and secondary employers are both present.

13

Ryan testified that he never told Mr. Ferraro that he should kick CSI off the job. (Tr. 680.) However, the court credits Mr. Ferraro's recollection that Ryan told him to "get rid" of CSI. Because of the significance of the conversation, it is reasonable that Mr. Ferraro would recollect it. Furthermore, although Ryan was a generally credible witness, his denial of the making the remark about "kick[ing] CSI off the job" ("No need to" make such a remark) was a bit too glib and his demeanor while testifying about it was flippant. (Tr. 680.)

Sunrise Construction did not fire CSI from the 24 S. Morgan job. (Tr. 98.) Mr. Ferraro did not file a complaint with the NLRB about Local 13's picket of CSI at the job site. However, following the July 28 meeting, Mr. Ferraro decided to move CSI to working night hours as of July 29, 2008 so as not to "lose any more time on the job" because the job was already behind schedule due to the earlier strike. (Tr. 96-97.) Mr. Ferraro believed moving CSI off the day shift would make the picketers "go away" because there would no longer be "a non-union company supposedly on site . . . ." (Tr. 97-98.) Mr. Cruz communicated the schedule change to CSI's superintendent, Pietro Molfese. (Tr. 98, 133-34.) "Night" work meant work starting at 3:30 p.m. and ending around 8:30 or 9:00 p.m. (Tr. 179, 234-35.) However, as discussed below, the testimony about whether CSI employees worked days, nights or both in the period after July 28 was ultimately irreconcilable.

Neither Local 13 nor the Chicago Regional Council picketed any other Karpedium job site in the summer of 2008. (Tr. 125.) In the fall of 2008, Sunrise Construction contracted with CSI to do some additional clean-up and repair work at 24 S. Morgan. (Tr. 368.)

*Local 13's knowledge of CSI's contract with Local 831*

Ryan testified that he did not learn that CSI had a contract with Local 831 until August 2008.

(Tr. 75.) That testimony was credible. Plaintiffs presented no evidence that CSI showed its contract with Local 831 to Ryan or any of the defendants before August 19, except for Pietro Molfese's incredible testimony about his confrontation with Ryan. Molfese testified that on July 26, he gave the contract to one of the picketers from Welch Drywall and she read it, but that testimony was impeached by his deposition testimony in which he denied giving her the contract.[8]

Although Mr. Ferraro testified that he told Ryan and Michael Sexton on July 28 that CSI had a union contract and pointed to Local 831's website, that is not the equivalent of showing Ryan an actual union contract. Furthermore, Mr. Ferraro could not recall when he actually saw CSI's contract with Local 831, raising a question about whether Mr. Ferraro's memory is correct about whether the discussion about Local 831 happened on July 28.

Supporting Ryan's credibility is the notable absence of any evidence by CSI about exactly when it entered into the contract with Local 831 or any testimony from Molfese about showing CSI's contract with Local 831 to Mr. Ferraro. The fact that the contract has a printed date of July 12, 2008 does not prove that it was entered into on that date. If CSI actually had a contract with Local 831 before the beginning of the picketing on July 26, and if Mr. Ferraro had actually seen such a contract by July 28, it is hard to understand why he or Molfese would not bring that to the attention of agents for Local 13 and the Regional Council immediately and demand that the picketing stop. On the contrary, Mr. Ferraro said that, on July 28, he ordered CSI to work nights so that there would not be a "non-union company supposedly" on the site. (Tr. 98.) It was more than three weeks later, August 19, when Molfese, by his own testimony (described below) came to the job site with the

---

[8] At his deposition, Molfese testified, "She's only a picketer. Why should I give her any information?" (Tr. 392.)

Local 831 contract and tried to show the contract to Ryan.

## The third labor dispute: Local 1185's picket for "area standards"

By all accounts, the picketing against CSI continued until at least August 19, 2008, when a confrontation occurred at the job site between Molfese and Ryan that is the subject of Molfese's personal claims, as discussed further below. At some date thereafter, Local 13 stopped picketing at the 24 S. Morgan site, and, instead, Local 1185 began picketing against CSI at the 24 S. Morgan site for "area standards."[9] Plaintiffs' complaint originally alleged damages against Local 1185 for that picketing, which plaintiffs alleged began on September 5, 2008. (Compl. ¶¶ 45- 50.) According to the complaint (which Molfese verified), in September 2008, CSI was "re-scheduled not to work" because of that picket. (Compl. ¶ 50.) Because Local 1185 was dismissed as a defendant, CSI's dispute with Local 1185 and any problems or costs related to it are not at issue in this case.

Therefore, any potential damages that CSI might be awarded in this case because of the picketing stopped when Local 13's picketing stopped and Local 1185's began. But the testimony was inconsistent about when that happened. Ryan and Ed Sexton testified that, after they became aware on August 19 of CSI's claim that it had a union contract, the Local 13 picket against CSI ended. (Tr. 603, 627, 680, 685.) Ryan, Ed Sexton, and Mr. Jaros testified that on the following day, August 20, the picketing by Local 1185 began at the 24 S. Morgan site for "area standards." (Tr. 594-95, 627, 681-83.) However, remuneration forms submitted by three Local 13 picketers, Joseph Jaros, Clarence Lembke, and a third person whose name is illegible, which were signed by Ryan, show that

___

[9] Although it was not developed in testimony, plaintiffs' complaint alleges that the focus of the dispute with with Local 1185 was that CSI did not pay employees in accordance with area labor standards. (Compl ¶ 80.)

Local 13 sought reimbursement from Chicago Regional Council for picketing on dates through August 29, 2008. (Pls.' Exs. 14-16.)

The only witness CSI presented on this point was Rocco Molfese (Molfese's son), who was called only in rebuttal. He testified that he observed the picketing against CSI continue past August 19 and that it took place every weekday until September 5, 2008, when the vests the picketers wore changed to read "1185" and on strike for "area standards." (Tr. 761-65.)

For reasons explained below, it is unnecessary to resolve this dispute other than to conclude that *no later than* September 5, 2008, the picketing by Local 13 stopped, and any damages allegedly incurred by CSI as a result of it also ended no later than September 5, 2008.

CSI's claimed damages under the LMRA

CSI claims two elements of damages from Local 13's alleged violation of the LMRA: the additional cost of working nights ($95,000 for night labor work and $8,500 for a night supervisor); and $4,500 for lost profits from another contract, the Monsoon Plaza project, that CSI allegedly would have obtained. (Pls.' Prop. Corr. Concls. Law ¶ 366.) Those are discussed in turn.[10]

*Evidence about when CSI worked nights*

Plaintiffs' evidence about the dates CSI actually worked night hours was irreconcilably inconsistent. Pietro Molfese testified that CSI's night work began on July 29 and lasted approximately two weeks, and that CSI returned to working days around August 10 or 11. (Tr. 166.)

---

[10] CSI also claims damages for overpayments to Molfese and lost business allegedly resulting from Molfese's inability to work due to the alleged assault. (Pls.' Prop. Corr. Concls. of Law ¶ 366.) Those are discussed below.

Molfese testified that the night work started on July 29 and lasted through October or November. (Tr. 233-34, 236-37.) But his testimony that CSI's night hours started on July 29 was impeached by a document he prepared in advance of his May 2009 deposition in which he stated that CSI kept a night crew from June 9 through July 14, 2008 to avoid the union picketers in the first labor dispute and again after the August 19, 2008 incident, and that from September 2 to September 8, CSI worked *both* days and nights to finish the job. (Defs.' Ex. 16; Tr. 353-58, 381.) Molfese further admitted that CSI worked days between July 26 and August 19. (Tr. 383.) In later testimony, Molfese testified (rather confusingly) that the entirety of the costs CSI incurred for night work began after August 19, 2008. (Tr. 408.) Also, Molfese testified that, due to the change to night work, CSI had to employ independent contractors. (Tr. 234-35.) But Ms. Ray, Molfese's office assistant, testified repeatedly that the independent contractors that CSI hired to do the night work began *after* August 19, 2008. (Tr. 503-04, 511-12, 518.)[11] Rocco Molfese, Molfese's son and an employee of CSI, was brought in to supervise the independent contractors' night work after August 19. (Tr. 520.) He testified that their night work continued "basically, the whole time" CSI was on the job site, and did not stop until December 2008. (Tr. 775.)

Adding to the confusion, Mr. Ferraro testified that, prior to July 28, he ordered both CSI and another contractor to work into the night (although not the night shift) "if they had to" because the job was behind schedule. (Tr. 125-126.)

CSI submitted no time records or other documentation regarding hours worked.

---

[11] She stuck to that date notwithstanding plaintiffs' counsel's efforts to lead her to change it. (Tr. 517-19.)

*CSI's costs associated with working nights*

In addition to the confusing and contradictory testimony about *when* CSI incurred its alleged extra costs for the change to night work due to Local 13's picketing, there was a failure of any reliable proof as to *the amount* of any extra cost associated with night work for which Local 13 could be held responsible if it were found liable.

Molfese testified that CSI's total costs for the night work was $95,000. (Tr. 239.) He did not adequately explain the basis for that figure, and no documentation was introduced to support it. Plaintiffs' proposed finding of fact on this point is the following:

> Ms. Ray testified: Total figure spent on individual contractors from August 19, 2008 to the end of the job was $160,000 to 180,000. (Tr. 527, L. 10-15.) That was for night work which included 30% left for employees. (Tr. 16-20). The total expended for independent contractors was $190,000 that leaves [sic] and then you deduct the installers labor cost – unused plus overtime costs. You come up with roughly $100,000 of additional expenditures and this is the $95,000 figure Mr. Molfese testified to as an out-of-pocket loss and is also the same as the $95,000 shown in the tax return schedules (casual labor testimony Carmine Molfese).

(Pls.' Prop. Findings Fact & Concls. Law ¶ 745, punctuation in original.) [Dkt 120.]

It appears that CSI's damage formula is to take the total amount expended for independent contractors on the 24 S. Morgan project, and subtract from it the amount of labor cost CSI believes was still to be expended from its original estimate of labor cost built into its contract with Sunrise Construction. That formula is questionable at best but in any event it is undermined by the evidence that the independent contractors continued long after any date for which damages could be awarded in this case. Any damages in the form of additional costs for independent contractors that could be awarded if defendants were found liable would be limited to *at most* three weeks: from August 19, when the independent contractors began, to September 5, when even plaintiffs' witnesses

acknowledge picketing was taken over by Local 1185. CSI's damage calculation would hold Local 13 liable for CSI's cost overruns on the project without proof of the actual additional costs, if any, incurred by CSI due to the change to night work during the limited period of Local 13's picketing.

Further, even the testimony offered to support the damage theory was inconsistent. As noted in plaintiffs' proposed finding quoted above, Ms. Ray testified that as of July 28, 60-70% of the labor costs estimated in the amount of CSI's contract with Sunrise Construction had been used. (Tr. 526.) But Molfese testified that as of July 28, only 40-50% had been used. (Tr. 234.) He also testified initially that, of the total contract amount between Sunrise Construction and CSI, approximately $260,000 was dedicated for labor costs. (Tr. 233.) Later, Molfese testified that the labor costs built into the contract totaled $292,202.75. (Tr. 415-16.)

Notably, while the independent contractors were identified, there was no evidence as to the amounts paid to each independent contractor, and by what amount that exceeded what CSI would have paid its regular employees if there had been no night shift. (*See* Tr. 235-36, 512-514.) Ms. Ray testified that CSI paid approximately $160-180,000 to independent contractors for work on the 24 S. Morgan job, in total, to the end of the job, and all of that cost was incurred after August 19. (Tr. 517-20.) Ms. Ray could not identify what amount each independent contractor was paid for specific periods of time. (Tr. 534.) Ms. Ray also admitted that CSI's estimate did not take into account that CSI did not pay a payroll tax for the independent contractors, which she testified would change the overall loss figure. (Tr. 538.)

Based on the evidence presented, there is no reasonable way to calculate or even estimate what additional cost, if any, CSI incurred because of the change to night work for the period of Local 13's picketing, or indeed whether all of the night work during that period was because of picketing

or because the project was behind in general.

CSI also seeks $8,200 in damages for the amount that Rocco Molfese was paid to supervise the night work after August 19, 2008. (Pls.' Prop. Findings Fact & Concls. Law ¶ 366; Tr. 520.) However, he testified that the night work he supervised continued after September 5 until December, 2008. (Tr. 775.) There was no evidence from which the court could conclude what amount of that $8,200 is attributable to the period August 19 through September 5, which is the longest period for which damages could be awarded (if defendants are liable) under any interpretation of the evidence. Furthermore, he was already a CSI employee and would have been doing other work for CSI even if he had not been supervising night workers. (Tr. 240-41.) CSI put in no evidence of what his regular pay was, and thus there is no basis to conclude that CSI incurred any additional cost because Rocco Molfese supervised night work.

Sunrise Construction did not offer CSI any additional compensation for the shift change beyond the contracted amount. (Tr. 98-99, 238-39, 528-29.) When CSI attempted to negotiate with Sunrise Construction about who was going to pay CSI's losses, Ms. Ray prepared an invoice for the extra cost but it was shredded. (Tr. 541.) In fact, at the time of trial Sunrise Construction had not paid CSI approximately $500,000 of what it owed under the contract. (Tr. 537.) None of the subcontractors on the 24 S. Morgan project have been fully paid because the owners of Sunrise Construction and the developers of the project were convicted on criminal charges and the property has changed hands among banks. (Tr. 127-28.)

*The Monsoon Plaza job*

Mr. Ferraro testified that, prior to July 28, 2008, CSI had another contract to provide tiling

services on a parking garage in Chicago, Illinois called "Monsoon Plaza." (Tr. 94-95.)[12] He testified that he cancelled that contract and hired another company to do the work because of Ryan's threat on July 28, 2008, that if CSI was used on any other job, Local 13 would follow and picket. (*Id.*) Molfese likewise testified that Mr. Ferraro told him that CSI would not get the Monsoon Plaza project because of problems with the carpenters' union. (Tr. 370.) In his deposition in May 2009, however, Molfese admitted that Mr. Ferraro did not specify whether the union problem that caused CSI to lose the Monsoon Plaza job was with the carpenters' union or with the tile-setters' union. (Tr. 370-71.)

The owner of the Monsoon Plaza project hired his own tile and carpet contractor after Mr. Ferraro pulled CSI's contract. (Tr. 129.) Molfese estimated that the lost profits to CSI from the Monsoon Plaza job was around $4,000 out of a total $15,000 cost. (Tr. 242.) Ms. Ray estimated that the lost profit totaled "a little" more than $4,500. (Tr. 531.)

The court concludes that Mr. Ferraro decided not to hire CSI for the Monsoon Plaza contract because of Ryan's threat to picket, although CSI was involved with disputes with other unions as well. But, again, there is no reliable basis upon which to calculate any amount of loss to CSI from that fact. CSI presented no evidence about the Monsoon Plaza project, whether it had started, and whether it was completed. Mr. Ferraro did not know the amount of CSI's contract on the Monsoon Plaza job. (Tr. 100.) CSI did not introduce into evidence any documents about that project, for example, its proposal or a signed contract. There was no evidence to support Molfese's and Ms. Ray's estimates of CSI's lost profit from that job. Any award of damages for lost profits on that

---

[12] The evidence did not include the name of the owner or general contractor of the Monsoon Plaza project, or the role of Karpedium, Inc., Mr. Ferraro's employer.

project would be speculation.

Altercation Between Molfese and Ryan on August 19, 2008

On the morning of August 19, 2008, Molfese went to visit the 24 S. Morgan job site. (Tr. 299.) Molfese encountered Mr. Jaros, one of the picketers, who called Ryan and Ed Sexton. (Tr. 580-81.) Molfese had never met Ryan before. (Tr. 394.) Ryan and Ed Sexton arrived at the site mid-morning. (Tr. 580-81, 612-13, 663.) Thereafter, the accounts of what happened diverge.

*Witness accounts*

Molfese testified as follows: He got to the job around 10:00 a.m., and parked his car on the south side of the alley adjacent to 24 S. Morgan, facing south. (Tr. 299-302.) He had his contract with Local 831 in his pocket. (Tr. 302.) Molfese went toward Ryan, who was standing in front of the building talking with Ed Sexton, and attempted to show him CSI's union contract with Local 831.[13] (Tr. 303.) Ryan said, "I don't want to see this piece of [expletive]. . . . I'm not going to honor it because it doesn't belong to our organization." (Tr. 304.) Molfese said, "Okay, fine" and rolled the contract up, put it in his pocket and walked to his car, which was parked nearby. (*Id.*) He put the contract on the passenger seat, and locked the door. (*Id.*) He walked toward the building and was about six feet away when he saw Ryan approach the car and try to open the door to get the contract. (Tr. 304-05.) Molfese told him to get away from the car. (*Id.*) Molfese noticed that the contract was face-up on the passenger seat, so he opened the door of the car and turned the contract

_____

[13] Molfese also testified that, while he talked to Ryan, Ed Sexton was standing two or three feet away, and Mr. Cruz was standing about ten to fifteen feet away. (Tr. 302-04.)

upside down.  (Tr. 305.)  Ryan had moved away to allow him to open the door.  (*Id*.)  Ryan then said,

"Who are these [expletive racial slur] trying to be able to take our work away from this area?"  (*Id*.)

Molfese testified:

> A:   Then, all of a sudden, he [Ryan] hit me, he kneed me right underneath my ribs.
> Q:   And how far was he standing from you when he did that?
> A:   Not even a foot away.
> Q:   And what happened next, if anything?
> A:   Then I asked, what did you do that for? And he said "I'm going to give you another [expletive] heart attack."  I said, how did you know I had a heart attack?  He goes, what do you think I am, [expletive] stupid? And he was yelling, hit me, hit me, hit me.

(Tr. 306.)   Ed Sexton came up and pulled Ryan away.  (*Id.*)  Molfese called 911, and police arrived

on the scene. (Tr. 306-07, 622, 672.)

On cross-examination, Molfese was asked about a somewhat different account of the event

that he had dictated to his secretary in a memorandum dated May 1, 2009.  (Tr. 359-63.)  In his

deposition, he had testified that the memorandum accurately reflected what went on at the 24 S.

Morgan job site.  (Tr. 354-55.)  The memorandum (Defs.' Ex. 3), was admitted for impeachment

only.  (Tr. 363.)  In the memorandum, Molfese described the event as follows:

> On August 19, 2008, the picketers were blocking the north alley at 24 South Morgan, which is the garage entrance.  I did not want any confrontations with the picketers, so I backed my car up and parked my car in the south alley.  I got out, walked towards the main entrance to confirm that the tile installation was complete in the lobby.  As I was walking to my car, I saw Pat Ryan standing by my car door trying to get in.  I asked him why he was trying to get in my car.  As I reached for the car - for the car handle to get in, he looked me straight in the face and kneed me in the ribs.  I asked him why he hit me.  He replied, I'm going to give you another [expletive] heart attack, and tried to close the car door while I was leaning on the car seat.
>
> Afterward Edmund Sexton walked by the car and told Pat Ryan, let's go.  I was calling 911.  Ten, 15 minutes later the police arrived, the police arrested Pat Ryan for

assault.

(Tr. 359, quoting Defs.' Ex. 3.)  At trial, Molfese affirmed those statements as accurate.  (Tr. 359.)

Notably absent is any mention of CSI's contract with Local 831, discussing it or putting it in the car,

any reference to Ryan saying "hit me, hit me, hit me," or the presence of Pietro Molfese.

Pietro Molfese testified that around 10:15 a.m. on August 19 he heard Ryan yell to Molfese,

"[W]ho the [expletive] are these [racial slur] trying to take our work," and saw Ryan knee Molfese

in the chest area on the left side.  (Tr. 168.)  After the altercation, Pietro Molfese went over to

Molfese, whom he observed to be bending over in pain and who told him that his side hurt.  (Tr.

169.)  Molfese told him to go back to work.  (Tr. 169.)  Pietro Molfese's testimony about the

exchange between Ryan and Molfese was almost word-for-word as Molfese testified, including Ryan

saying "hit me, hit me, hit me."  (Tr. 169.)  At his deposition, however, Pietro Molfese did not

mention Ryan saying "hit me, hit me, hit me."  (Tr. 171.)

Ryan testified as follows:  He came to the job site on August 19 because one of the picketers

said that the president of CSI was there saying that CSI had a union contract.  (Tr. 663-64.)  Upon

arriving at the job site, the picketers pointed out Molfese, who was screaming that CSI had a union

contract, that it was illegal for Local 13 to picket them, and that he was going to sue.  (Tr. 664.)

Molfese had the contract rolled up and was whipping it around, very excited.  (*Id*.)  Molfese would

not let Ryan see the contract.  (Tr. 665.)  Ryan told the picketers to turn their vests around while he

figured out the status of CSI's union contract.  (Tr. 665.)  Molfese then walked south on Morgan

Street and put the papers inside his vehicle on the passenger side.  (*Id*.)  Ryan approached the car and

attempted to look at the contract through the window, but did not try to manipulate the handle.  (Tr.

666.)  Molfese came running over and pushed Ryan away from car, then opened the car door

(clipping Ryan's elbow), flipped the papers over and slammed the door shut. (Tr. 666-67.) A heated argument ensued. (Tr. 667-68.) After the argument had gone on for 30 seconds to one minute, Ryan observed a scar on Molfese's chest that he recognized was likely from a recent heart operation, and at that point he stepped back and told Molfese he did not want to give him another heart attack. (Tr. 669-70.) Ryan testified that he walked away to Mr. Ferraro's office with Ed Sexton.

Ed Sexton testified that he observed the entire argument from about 50 feet away, and that he did not witness Ryan knee Molfese in the chest or otherwise strike him in any way. (Tr. 618-19, 621.) He said that he saw Ryan and Molfese arguing in the alley near Molfese's car, but then they walked away from each other. (Tr. 618-19.) He and Ryan went to see Mr. Ferraro, who said he would look into the status of CSI's union contract. (Tr. 619-20.) Molfese came in and said he wanted to call the police about Ryan. (Tr. 620.)

Mr. Ferraro denied that Ryan or Ed Sexton visited his office before the police were called. (Tr. 102-03.) He testified that someone called him because there was an altercation at the site and everyone was out on the street. (Tr. 102.) By the time he got there, there were police cars, Ryan was in handcuffs and Molfese was sitting on the curb. (Tr. 102-03.)

The police arrived on the scene around 11:00 a.m. and placed Ryan in handcuffs. (Tr. 623, 672.) Mr. Ferraro and Mr. Cruz testified that they saw Molfese, who told them Ryan had hit him, but neither of them personally witnessed any physical altercation between Molfese and Ryan. (Tr. 108, 129, 138-41, 147-48, 152-53.) Mr. Ferraro and Mr. Cruz both testified that Ed Sexton asked them to talk to Molfese about not "pressing charges" against Ryan. (Tr. 107, 147.) Mr. Cruz did so, but Molfese refused. (Tr. 147.) Ryan was released after being in handcuffs for about ten minutes. (Tr. 672.) In Ryan's version, the police officer saw the cut on Ryan's elbow and said that

Ryan was the victim.  (Tr. 672-73.)  Ryan was not taken to the police station, and no criminal charges were filed.  (Tr. 673.)  Ryan and Ed Sexton then left the job site to have lunch.  (Tr. 624, 674.)

Keith Jutkins, president of Local 1185, arrived at the job site right before noon on August 19, after receiving a phone call that non-union carpenters were working there.  (Tr. 569-74.)[14]  He encountered Molfese shortly after arriving.  (Tr. 570.)  Mr. Jutkins had known Molfese for years and had a cordial relationship with him, although he described Molfese as "a non-union contractor."  (Tr. 566.)  Molfese told Mr. Jutkins that he had been in an argument with Ryan earlier that day, but did not tell him that he and Ryan were involved in a physical altercation or that Ryan had hit him or kneed him.  (Tr. 570-72.)  Mr. Jutkins did not observe Molfese to be in any visible pain.  (Tr. 570-71.)  Mr. Jutkins did not observe any police presence at the job site at that time.  (Tr. 571.)  Mr. Jutkins and Molfese were then joined by Ed Sexton and Ryan, who came back to the job site after Mr. Jutkins called Ryan.  (Tr. 570-72, 625-26.)  Mr. Jutkins testified that the four men stood together and had a conversation.  (Tr. 571-72.)  Ryan and Molfese did not speak directly to each other at that time.  (Tr. 626.)

Molfese admitted that he encountered Mr. Jutkins, but testified that he told him he had been hurt by Ryan.  (Tr. 704-05.)  Molfese testified that Mr. Jutkins offered to take him to lunch, but he refused because he was in pain and needed to go home.  (*Id*.)  When Ryan and Ed Sexton returned, Molfese testified he engaged in no conversation with them but instead left the job site.  (*Id.*)

---

[14]  At the time of trial, Mr. Jutkins held the positions of assistant to the president of Chicago Regional Council and president of Local 1185.  (Tr. 564, 574.)

*Credibility findings*

After carefully considering the testimony of each witness, including the witness's demeanor while testifying, his ability to observe the events, his interest, if any, in the outcome, and any bias the witness might have, the court concludes that Molfese has not proved his allegation that Ryan intentionally hit or kneed him on August 19.

Pietro Molfese's testimony that he saw Ryan knee Molfese, was, like his earlier testimony, not credible. It appeared that he was tailoring his testimony to fit his cousin's version, even where it diverged from his own deposition testimony. He has a personal interest in supporting his cousin's claim because his job with CSI, his cousin's company, is the only job he has held in the twenty years since he came to this country. (Tr. 184.)

Countering Pietro Molfese's testimony is the testimony of Ed Sexton, who also said he saw the argument between Ryan and Molfese and that he did not see Ryan hit or knee Molfese. Ed Sexton's testimony has to be viewed in light of the fact that he is an employee of Local 13. But a point weighing in favor of his credibility over Pietro Molfese's is the fact that Molfese admitted both in his testimony and in his personal memorandum that Ed Sexton was there, while he did not mention Pietro Molfese being at the scene in his memorandum.

Most important, though, is the testimony of the two participants. While Ryan's recollection is not entirely congruent with Mr. Ferraro's testimony, his version of the altercation was more credible than Molfese's. Ryan admitted that he exchanged verbal insults with Molfese, while Molfese does not attribute to himself any heated comments. That is not consistent with the circumstances – Molfese arriving at a job site where picketing allegedly was causing him to incur a lot of extra cost – and it is not consistent with Molfese's demeanor at the trial. Ryan's testimony

that Molfese was very agitated that day is much more credible. Molfese's testimony that he was simply opening the car door to turn the contract over when Ryan "all of sudden" kneed him is not believable. It is more likely that Molfese pushed Ryan away from his car than that Ryan abruptly and without provocation intentionally kneed Molfese in the chest near a job site where various people were gathered. It is possible to imagine a scenario in which some pushing occurred on both parts, *i.e.*, that Molfese pushed Ryan out of the way to get into the car and Ryan pushed back. But that has never been Molfese's story, and that is not his claim. His claim is that Ryan, whom he first met that day, suddenly and without provocation kneed him in the chest and expressed the intention to give him another heart attack. The court finds that Molfese has not carried his burden of proof on that disputed question of fact.

The credibility of Molfese's testimony that he was kneed by Ryan and suffered serious physical injury as a result is also diminished by his actions following the incident and certain objective evidence, as described below. The fact that Molfese blames virtually every physical ailment he suffered thereafter and substantially all losses by his company in 2008 on the August 19 encounter with Ryan is so unrealistic that it casts doubt upon the reliability and credibility of Molfese's other testimony, including his testimony about what happened on August 19.

Molfese's physical condition and actions after the altercation.

Notwithstanding his testimony that he was in great pain following the blow from Ryan, Molfese did not call an ambulance or go to the emergency room following the altercation. (Tr. 311.) Instead, as described above, he spoke with Mr. Ferraro, Mr. Cruz and Mr. Jutkins at the job site. At about noon, he drove himself to the CSI office, which is in Addison, Illinois, a considerable distance

from 24 S. Morgan St. in Chicago. (Tr. 205, 312-13.) On the way to the office, he called his own doctor, Dr. Maida, but there were no openings for him to come in that day or the following day. (Tr. 311-13.) He stayed at the office about a half-hour, until about 2 p.m., but "felt so bad" that he went home. (Tr. 313.) Upon arriving home, Molfese testified, he experienced pain so intense he could not go upstairs, he was unable to eat, unable to stay up or lay down. (Tr. 316-17.) He had a bad headache, and he testified he had never had headaches before in his life. (Tr. 317-18.) He laid down on the sofa for the rest of the day and was unable to walk, use the bathroom, or sleep. (Tr. 316-19.) That condition lasted three weeks. (Tr. 317.) In fact, he testified, he still cannot sleep as of the date of the trial two years later. (Tr. 319.)

The following day, on August 20, Molfese testified, he stayed on the couch and did not go to work. (Tr. 319-20.) He observed blood in his stool and urine and was concerned because he had a pre-existing heart condition, and he had open-heart surgery in December 2007. (Tr. 252, 322-23.) He had been warned by doctors and nurses to look out for such symptoms due to the medication he took daily for his heart condition. (Tr. 322-23.) In his deposition, Molfese acknowledged suffering from hemorrhoids at this time, although he denied it at trial. (Tr. 401-02.) He phoned his physician, who recommended that if he saw more blood, he should go to the emergency room or urgent care. (Tr. 323.)

The morning of August 21, Molfese visited an urgent care facility, where he was examined and released. (Tr. 322-23, 328, 350-51.) Following that visit, Molfese flew from Chicago to Arizona with one of his sons to enroll him in college. (Tr. 332-33, 350-51.) He stayed in a dorm room there for one or two days. (Tr. 334-35.)

On August 26, Molfese went to see his own doctor, Dr. Gerald Maida. (Tr. 281, 337; Pls.'

Ex. 25.) At that time, he testified, he was afraid of Ryan coming back after him and giving him a heart attack. (Tr. 339.) Independent of Ryan, he was also afraid of having another heart attack. (*Id.*) He had fatigue, back pain, and shortness of breath. (Tr. 340.) He was afraid of someone coming after him or his wife, which caused him problems including sexual impotence. (Tr. 342.)

Molfese testified that when he went to see Dr. Maida on August 26, he told the doctor that he was in pain because he had been hit in the stomach underneath his rib cage. (Tr. 283.) Molfese also testified that he told Dr. Maida that he had blood in his stool and urine, as well as headaches, back pains, bad pain in his side and tenderness by his chest. (Tr. 282.) Dr. Maida testified that Molfese reported discomfort in the lower left chest under the ribs that had been initially rather severe. (Tr. 457.) Dr. Maida also testified, "There was no other specific issue at that time." (*Id.*)[15]

Molfese also testified that he had bruising on his chest from where Ryan had kneed him, which was faint but still visible when he went to see Dr. Maida. (Tr. 399-400.) Dr. Maida, however, observed no bruising at that time. (Tr. 463-64.) Dr. Maida also testified that the first time Molfese complained about blood in his stool was February 2009. (Tr. 464-65, 470.) In a letter dated September 10, 2008, Dr. Maida advised Molfese to restrict his work schedule and to do no heavy lifting. (Tr. 247, 457-58; Pls.' Ex. 25.) On October 15, Dr. Maida recommended that Molfese could work 4-5 hours per day. (Tr. 247-48, 458-59; Pls.' Ex. 26.)

After seeing Dr. Maida, Molfese went back to the office on August 26 for a couple of hours.

_____

[15] Because plaintiffs did not serve a Rule 26(a)(2) disclosure with respect to Dr. Maida as an expert witness, the doctor was not permitted to testify under Federal Rule of Evidence Rule 702. (Tr. 447-51.) Accordingly, the doctor's diagnosis and evidence regarding medical records and tests, and the interpretation of those records and tests, was excluded from evidence. However, Dr. Maida was permitted to testify about symptoms Molfese reported to Dr. Maida and about the advice Dr. Maida gave him. (Tr. 451.)

(Tr. 337.)  Ms. Ray testified that Molfese returned to work on around August 21 at which time he showed her his abdomen and a bruise that was darker than his skin complexion around his rib cage. (Tr. 486-87.)  Notably, when Molfese came into the office on August 26 he returned three calls about possible jobs.  (Tr. 338.)  One was bad news that CSI had lost one job, and the other two were "we'll see what happens."  (*Id*.)  There was no suggestion or evidence that the CSI's failure to get those jobs was related to any labor disputes.

In late August and September 2008, Molfese testified, he experienced symptoms of ongoing pain, fatigue, shortness of breath, ulcers, stress, blood in his stool, and nervousness.  (Tr. 340-45.) Molfese reduced his schedule at work, which had previously consisted of ten to twelve-hour days, and was unable to resume many of his duties, including visiting customers and speaking on the phone.  (Tr. 249-52, 522.)  He also gained weight because of lack of exercise.  (Tr. 343-44.)

In the month following August 19, Ms. Ray observed that Molfese worked a reduced schedule of approximately three hours a day.  (Tr. 492.)  Ms. Ray also observed that Molfese looked tired and moved slowly, but he did not complain to her of symptoms.  (Tr. 496.)  Ms. Ray observed that Molfese did not resume a full work schedule for several months.  He did not get out to the job sites, so she sent someone else.  (Tr. 492-93.)  At one point she and another employee attempted to negotiate with customers, but they "lowballed a job" resulting in a "pretty big loss," so after talking with Molfese, they "tried to avoid doing it from there."  (Tr. 499-500.)  About the third month after August (that is, October 2008), she and Molfese had a lot of arguments about how things were being run at CSI.  (Tr. 500-01.)  She testified that in the fall,

> [Molfese] no longer wanted to deal with our regular customers or new customers.
> . . . [H]e was always aggravated and agitated, real short with me, and a lot of
> responsibilities that were not mine before fell on Rocco [Molfese] and myself.  And

we did the best we could, but I know that we did a lot of things wrong.

(Tr. 502-03.)

Ms. Ray testified that CSI continued to pay Molfese his full salary over the period of September 2008 through December 2008, which was $1,500 per week, but that he only worked three to four hours per day at that time. (Tr. 522.) As a result, Ms. Ray calculated that CSI overpaid Molfese $11,000 over that time period. (*Id.*) Molfese himself estimated that CSI overpaid him $40,000 of his salary, but did not provide a basis for that figure except that it reflected his decreased work schedule. (Tr. 270.)

Plaintiffs' proposed damages for the assault and intentional infliction of emotional distress claims

Molfese seeks $150,000 in compensatory damages and $1.5 million in punitive damages on each of Count II (the assault and battery claims) and Count III (intentional infliction of emotional distress). (Pls.' Prop. Corr. Concls. Law ¶ 322.) Molfese presented no evidence of any economic loss to him from the alleged attack. As noted above, CSI continued to pay him his full salary even though he was working reduced hours. There was no evidence of medical bills or other expenses.

CSI is seeking to recover $10,800 that it claims it paid Molfese for "non-productive time." (Pls.' Prop. Corr. Concls. Law ¶ 364.)[16] CSI also seeks damages of $100,000 in lost profits for the period between August 20, 2008 and December 17, 2008, on theory that Molfese was not able to close bids in that period following the altercation. (Pls.' Prop. Corr. Concls. Law ¶ 359.) The evidence of those damages was sketchy and speculative. The only documents that were introduced

---

[16] CSI is a Subchapter S corporation, with Carmine Molfese and Victor Molfese the only shareholders. (Pls.' Ex. 21, bates no. P302 and 304.)

to support that claim were CSI's tax returns for 2007 and 2008, which show about $160,000 less gross profit in 2008 ($783,888, down from $945,789). (Pls. Exs. 21 and 22.) There is no support in the record for Molfese's estimate of $700,000 loss to CSI from existing customers in August to December, 2008 compared to the comparable period in 2007. (Tr. 275.) Ms. Ray estimated that the percentage of successful bids Molfese obtained for CSI dropped in August 2008 from 50-60% the prior month to 20%. (Tr. 494-95.) Again, there was no documentary support for that estimate, and no reliable basis to believe that any drop that occurred was caused by Molfese's absence as opposed to the many other factors that can cause a contractor to win or lose contracts.

Plaintiffs' position is that CSI's diminished profit in 2008 is attributable to Molfese's limited work schedule, which in turn is attributable to the Ryan's striking Molfese. The court rejects that position as lacking evidentiary support and relying on the fallacy of *post hoc, ergo propter hoc*. The testimony of Molfese and Ms. Ray that Molfese worked fewer hours in the fall of 2008 is credible. It is also credible that Molfese suffered some degree of stress, anxiety and physical symptoms related to stress and his pre-existing heart condition in the fall of 2008. The court, however, concludes that the evidence fails to establish that a kneeing such as Molfese claims Ryan inflicted or Ryan's alleged threat to give him another heart attack was or would be responsible for all of those symptoms (from headaches to weight gain) or would prevent Molfese from working to the extent he claims for a period of four months. After all, he was well enough immediately after the incident to drive himself to his office in order to work and to fly to Arizona with his son for several days. The claim that the August 19 incident limited his ability to work until December is not credible.

Nor does the evidence support CSI's claim that its diminished gross income arose solely from Molfese's limited hours from August to December 2008. Plaintiffs' evidence failed to account for

the many other factors that might reasonably have contributed to CSI's failing to make as much gross profit in 2008 as it did in 2007. Molfese underwent heart surgery in December 2007, and worked a reduced schedule until June 2008. (Tr. 407.) Although that period of reduced schedule was almost twice as long as the August to December period, Molfese claimed that CSI did not lose "much" money in the winter and spring when he was recovering from surgery because his brother came from out of town to help him then. (Tr. 407.) Plaintiffs introduced no records to support that testimony, and it is at odds with their argument that Molfese's personal efforts were critical to CSI's ability to get contracts. Also, the nationwide economic crisis in 2008 resulted in a dramatically reduced demand for flooring workers, according to testimony from Mr. Jutkins. (Tr. 575.) But again, Molfese discounted the economic crisis as a possible contributing factor to CSI's diminished gross profits in 2008 because, in his opinion, it would not have been a problem for his company since they worked with repeat customers. (Tr. 273.)

The court finds CSI's claim of damages to be speculative and not supported by the competent and reliable evidence.


CSI's complaint to the NLRB

On August 25, 2008, CSI brought a complaint to the NLRB that Molfese was physically assaulted by Local 13 agent "Pat O'Brien." (Defs.' Ex. 5.) The complaint, which was signed by Molfese, identified the date of the assault as "on or about August 18." (*Id.*) Michael Sexton admitted that he did not undertake an investigation of the complaint because he did not believe a physical assault had occurred and he thought the complaint was "ridiculous." (Tr. 643, 649-50.) The complaint was later dismissed pursuant to a no-fault settlement agreement between CSI and Local

13.  (Defs.' Ex. 6.)  The terms of that agreement required Local 13 to hang a sign in its office which stated: "We will not intimidate or coerce employees . . . by inflicting physical harm on their supervisors during a labor dispute."  (*Id.*)  By entering into the agreement, Local 13 did not admit any violation.  (*Id.*)

## II.    Conclusions of Law

### A.    Jurisdiction and Venue

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the LMRA claim because it arises under federal law.  This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they arise out of alleged incidents also raised in the federal claim.  The parties have consented to the jurisdiction of a magistrate judge.  Venue is proper because the parties are located in the Northern District of Illinois and the action arises from events that occurred in this District.

### B.    CSI's LMRA claim.

Legal standard

As discussed above, the LMRA states that it is an "unfair labor practice" for a labor organization or its agents to "threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce," with the object of  "forcing or requiring any person . . . to cease doing business with any other person . . . *Provided*, [t]hat nothing in this clause . . . shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."  29 U.S.C. § 158(b)(4)(ii).  The law preserves a union's right to pressure a "primary" employer with which it

has a grievance (in this case, CSI), while shielding a "secondary" employer not directly involved in the labor dispute (in this case, Sunrise Construction). *BE&K Constr. Co. v. Will & Grundy Counties Bldg. Trades Council*, 156 F.3d 756, 761 (7th Cir. 1998).

The statute does not speak in terms of secondary activity, but rather "condemns specific union conduct directed to specific objectives." *Local 761, Intl. Union of Elec., Radio and Machine Workers, AFL-CIO v. N.L.R.B.*, 366 U.S. 667, 672 (1961) (discussing earlier version of the statute). Coercion of a secondary employer is unlawful even where the union acts with "mixed motives," partially primary and partially secondary, so long as one of the union's objectives is to influence the secondary employer to "bring pressure to bear" on the primary employer. *Tri-Gen Inc. v. Intl. Union of Operating Engrs., Local 150, AFL-CIO*, 433 F.3d 1024, 1034 (7th Cir. 2006) (internal quotations and citation omitted).

"Important as is the distinction between legitimate 'primary activity' and banned 'secondary activity,' it does not present a glaringly bright line." *Local 761*, 366 U.S. at 673. The situation is particularly complicated where, as here, the primary employer (CSI) shares a common work site (24 S. Morgan) with the secondary employer (Sunrise Construction).

> Lawful primary picketing often has substantial and foreseeable effects on secondary employers. . . . When the primary employer shares a work site with the secondary employer, the picketing is presumed lawful so long as the union does not intend to enmesh the secondary employer in the dispute.

*Tri-Gen*, 433 F.3d at 1038 (internal quotations and citation omitted).

> In such 'common situs' situations, the union has every right to picket the primary employer at the work site, even though this picketing might incidentally, but foreseeably, have a substantial effect on secondary employers. Section 8(b)(4) proscribes only union activity whose 'object' or purpose is to coerce secondary employers. And there is an important distinction between *intending* to enmesh secondary employers in a dispute not their own, and acting with knowledge that

> secondary employers will inevitably be affected by the union's actions. Even if the union's picketing has substantial (*and foreseeable*) secondary *effects*, that conduct does not violate section 8(b)(4) unless the employer satisfies its burden of establishing that the union *intended* to cause disruption of the secondary employer's business.

*Mautz & Oren, Inc. v. Teamsters, Chauffeurs, and Helpers Union, Local No. 279*, 882 F.2d 1117, 1121 (7th Cir. 1989) (citations omitted, emphasis in original).

"Primary picketing always has as one of its goals the inducement of secondary employers to stop dealing with the primary employer, and the object of inducing this disruption is protected." *Tri-Gen*, 433 F.3d at 1041.

> A strike, by its very nature, inconveniences those who customarily do business with the struck employer. Moreover, any accompanying picketing of the employer's premises is necessarily designed to induce and encourage third persons to cease doing business with the picketed employer. It does not follow, however, that such picketing is therefore proscribed by Section 8(b)(4)(A) of the Act.

*Local 761*, 366 U.S. at 675 (internal quotations omitted) (citing earlier version of the statute). Thus, the plaintiff must show both that the union intended to pressure the secondary employer and that the union engaged in illegal conduct to that end. The finder of fact must determine "that the defendants both engaged in illegal coercive conduct, and intended to influence the secondary employers." *BE&K*, 156 F.3d at 767.

Where the primary and secondary employers share a common work site, as was the case here at 24 S. Morgan, courts apply the so-called "*Moore Dry Dock* standards" (named after *In re Sailors' Union of the Pacific AFL and Moore Dry Dock Co.*, 92 N.L.R.B. 547, 549 (1950)). *BE&K Constr.*, 156 F.3d at 761; *Mautz & Oren,* 882 F.2d at 1121. Under those standards, picketing is presumed to be lawful primary activity if:

> (1) it is strictly limited to times when the situs of the dispute is located on the

secondary employer's premises; (2) the primary employer is engaged in its normal business at the situs; (3) it is limited to places reasonably close to the location of the situs; and (4) it discloses clearly that the dispute is with the primary employer.

*BE&K Constr.*, 156 F.3d at 761 (internal quotations omitted).

However, even if the *Moore Dry Dock* standards are met, the presumption that the union activity is lawful may be rebutted with a showing that it was the union's "object" or intent to engage in unlawful secondary activity. 29 U.S.C. § 158(b)(4)(ii); *Tri-Gen,* 433 F.3d at 1034. The inquiry is a factual one into the union's state of mind, which is determined by examining "the totality of the union's conduct in the given situation." *Tri-Gen.,* 433 F.3d at 1038 (internal quotation omitted); *R.L. Coolsaet Constr. Co. v. Local 150, Intl. Union of Operating Engrs.*, 177 F.3d 648, 655 (7th Cir. 1999). Intent to coerce a secondary employer is not shown simply because a union's conduct has substantial and foreseeable effects on the secondary employer. *Mautz*, 882 F.2d at 1121. Rather, the plaintiff must present evidence that the union aimed its activity at the secondary employer. *Tri-Gen*, 433 F.3d at 1040.


Local 13 substantially adhered to the *Moore Dry Dock* standards

CSI contends that Local 13 violated the *Moore Dry Dock* standards in three ways: (a) by having picketers on the job site when CSI was not there; (b) failing to inquire whether CSI had a contract with any labor organization before beginning to picket; and (c) by picket signs depicting a rat and reading "scab" that failed to disclose that the dispute was with CSI. (Pls.' Prop. Corr. Concls. Law ¶¶ 4-6; 9.)

As to the first point, CSI contends that the picketers were at the job site during the days from August 19 until the end of August, when, CSI argues, CSI workers were not working days. (Pls.'

Prop. Corr. Concls. Law ¶ 10.)  There are a number of problems with that argument.

There was no evidence that Local 13 intentionally scheduled picketing when CSI employees were not at the site.  Rather, plaintiffs imply that Local 13 should not have scheduled picketers during the day because Local 13 should have known that CSI employees were not on the job during the day. That is contrary to the evidence, described above, that CSI employees worked days as well as nights during the picketing.

In support of its argument, CSI relies on the testimony of Rocco Molfese, who was called only in rebuttal.  A rebuttal witness is not the proper way for a party to establish elements of its case in chief.  *Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 630 (7th Cir. 2008).[17]  But Rocco Molfese's testimony did not establish that there were no CSI workers on the job during the day after August 19.  He testified that *the independent contractors* he was supervising worked between 3 p.m. and finished up at about midnight or 2 a.m., although he himself (a CSI employee) came to the site around 10 a.m. each day, which is when he saw the picketers.  (Tr. 745-49.)  He then left the site and returned later.  That does not establish that there were never CSI employees working days during that period.  Various witnesses, including Molfese himself, testified that CSI workers worked during the day after the picketing began.  (Tr. 383.)  Pietro Molfese testified that he went back to working days after August 10 (which is why, he says, he was on the job site in mid-morning on August 19 when the altercation occurred).  (Tr. 166, 299, 307.)  He did *not* testify that he stopped working days

---

[17]  "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party.  Testimony offered only as additional support to an argument made in a case in chief, if not offered to contradict, impeach or defuse the impact of the evidence offered by an adverse party is improper on rebuttal."  *Peals*, 535 F.3d at 630 (internal quotations and citations omitted).

after August 19.

It was not unreasonable for Local 13 to schedule picketing during the day in light of all the evidence that CSI worked at 24 S. Morgan days, nights or both at various times during the relevant period. Local 13's picketing schedule, even if it included days, was a substantial effort to comply with the *Moore Dry Dock* standards. *See Mautz*, 882 F.2d at 1121 n. 2 (substantial compliance is enough to meet *Moore Dry Dock* standards) (collecting cases).

Furthermore, the evidence established that it was Local 13's practice for picketers to flip their vests to read "Observer" at times when CSI was not present at the work site. Although there may have been occasions when that was not done, vests were appropriately worn most of the time. One can hardly fault Local 13 and its picketers for not being sure on each occasion whether CSI's workers were on the site, given the fact that plaintiffs' witnesses could not consistently testify about CSI's work schedule even at the trial.

As discussed in the findings of fact above, the court also finds that the evidence does not support the other two ways CSI says Local 13 violated *Moore Dry Dock* standards – alleged failure to inquire about the union status before picketing and the alleged use of "scab" and "rat" signs that did not identify CSI as the subject of the dispute. (*See* Sect. I above.)

The evidence at trial established that Local 13 substantially adhered to the *Moore Dry Dock* standards by limiting "on strike" picketing to the 24 S. Morgan location and dates it could reasonably believe that CSI was working there, and by clearly identifying on the picketers' vests that the picket was against CSI. Therefore, Local 13's picketing is presumed lawful primary picketing.

Local 13's focus was on CSI, not Sunrise Construction

In order to rebut the presumption that arises by substantial conformance with the *Moore Dry Dock* standards, CSI would have to present evidence that Local 13 and Chicago Regional Council intended to cause a disruption of Sunrise Construction's business other than the foreseeable consequences of lawful picketing. There was no such evidence. Local 13 did not picket any other project being managed by Karpedium. Ryan did threaten that if Karpedium used CSI on another project, Local 13 would picket that project, but lawful picketing is protected activity. Ryan could properly inform Mr. Ferraro that Local 13 would picket a site using a contractor with whom it had a dispute.

Mr. Cruz understood, as he testified, that Local 13's focus was CSI. The focus was not Karpedium or Sunrise Construction. The picketers and Ryan told Mr. Cruz and Mr. Ferraro that if CSI no longer worked at the site, the picketing would go away. The evidence here is in contrast to the *BE&K* case, where the evidence supported a jury verdict that the union threatened illegal secondary pickets. The evidence in the *BE&K* case included tape recordings of a union representative telling the neutral employer ir could "expect a lot more serious problems than they've had in the past" if they did not fire a non-union contractor and that the union was "coming after [the neutral] . . . and not just on one front." *BE&K*, 156 F.3d at 768-69.

Here, the evidence, including Ryan's statements that Mr. Ferraro should "get rid of CSI" and that Local 13 would picket sites where CSI works, establishes nothing more than that the union tried to persuade Karpedium and Sunrise Construction to cease using CSI and that pickets might be established against CSI if CSI were on the job site. Such action by the union is "entirely legal." *BE&K*, 156 F.3d at 769.

Mr. Ferraro decided to move CSI to night work because he wanted to minimize disruptions to the job from picketing, and terminated CSI's contract on the Monsoon project for the same reason. Mr. Ferraro acknowledged that all picketing, whether unlawful or not, is disruptive to some extent. (Tr. 112.) *See Tri-Gen*, 433 F.3d at 1039 (secondary employer's independent decision to terminate contractor over fear that union picketing would interfere with business sales was a lawful secondary effect of primary picketing).

CSI did not prove that Local 13's and the Chicago Regional Council's activities were aimed at any entity but CSI, with whom they reasonably believed they had a dispute.

No reliable proof of damages

Moreover, even if the court were to find, *arguendo,* that Local 13 engaged in unlawful picketing under the LMRA, CSI did not establish a causal connection between that activity and any damages suffered by CSI as a result that were not unreliably speculative. Recoverable damages under Section 303 of the LMRA include "the damages by [the plaintiff] sustained and the cost of the suit." 29 U.S.C. § 187(b). That has been interpreted to mean only actual, non-speculative compensatory damages that are the proximate result of the unlawful conduct. *Summit Valley Indus., Inc. v. Local 112, United Bhd. of Carpenters and Joiners of America*, 456 U.S. 717 (1982) (citing *Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton*, 377 U.S. 252, 261-62 (1964)); *Austin Co. v. Intl. Bhd. of Elec. Workers Local Union No. 701*, 665 F. Supp. 614, 617 (N.D. Ill. 1987) (same). A nexus must be established between the unlawful secondary activity and the injuries to the plaintiff. *Id.* While the inability to provide an exact damage amount will not preclude an award, at the very least a just and reasonable approximation of damages must be established. *R.I.*

43

*Coolsaet,* 177 F.3d at 660.

CSI's position in this case has been that, following alleged threats made in the July 28, 2008 conversation between Ryan, Michael Sexton, and Mr. Ferraro, Mr. Ferraro moved CSI to the night shift and took away the Monsoon Plaza job, both of which caused losses to CSI's business. However, the testimony from CSI's own witnesses had such divergent and inconsistent stories about when the night work occurred and what portion was the result of picketing as opposed to other circumstances, and such a lack of reliable evidence about what that work cost, that the court could not ascertain a "just and reasonable" approximation of the damages CSI suffered, even if liability had been shown. Molfese's and Ms. Ray's unsupported estimate of CSI's claimed lost profit on the Monsoon Plaza job suffers the same fault.[18]

In summary, the court finds in favor of the defendants Local 13 and the Chicago Regional Council and against CSI on Count I of the Complaint.

### C.    Molfese's state law claims.

Molfese brings claims of assault, battery, and IIED against all defendants for the events that transpired between him and Ryan on August 19, 2008. (Compl.) Under Illinois law, assault is defined as "an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the

---

[18] CSI also seeks attorneys' fees and punitive damages for Local 13's conduct. Attorneys' fees and punitive damages do not appear to be available for CSI's claims under the LMRA. *Summit Valley*, 456 U.S. at 721-23 (Section 303 of the LMRA does not authorize attorneys' fees); *see also Local 20 v. Morton*, 377 U.S. at 260-61 (noting punitive damages "conflict with congressional judgment" reflected in statute); *Smart v. Intl. Bhd. of Elec. Workers*, No. 07-CV-94-DRH, 2010 WL 1286073 at *7 (S.D. Ill. Mar. 26, 2010); *D.J. Electric v. IBEW Local 701*, No. 85-C-10421, 1987 WL 11435 at *1 (N.D. Ill. May 22, 1987).

apparent present ability to effectuate the attempt if not prevented." *Yang v. Hardin*, 37 F.3d 282, 286

(7th Cir. 1995) (citing *Parrish by Bowker v. Donahue*, 443 N.E.2d 786, 788 (Ill. App. 1982)).

Battery requires an intent to cause harmful or offensive contact with another, or an imminent

apprehension of such contact and such contact results. *Cohen v. Smith*, 648 N.E.2d 329, 332 (Ill.

App. 1995).

To recover on a claim of IIED, Molfese must establish that Ryan's conduct was extreme and

outrageous, the conduct was either intentional or had a high probability of causing emotional

distress, and the conduct did in fact cause emotional distress. *See McGrath v. Fahey*, 533 N.E.2d

806, 809 (Ill. 1988). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other

trivialities" do not qualify as extreme and outrageous conduct. *Feltmeier v. Feltmeier*, 798 N.E.2d

75, 80 (Ill. 2003) (internal quotations omitted). Rather, the defendant's conduct must be so extreme

as to go beyond all possible bounds of decency such that it is regarded as intolerable in a civilized

community. *Id.* at 80-81. The outrageousness of the conduct is determined in view of all the facts

and circumstances. *McGrath*, 533 N.E.2d at 811. The emotional distress must be so severe that no

reasonable person could be expected to endure it. *Id.* at 809.

Molfese has not established liability on the part of any of defendants for his state law claims.

The evidence established that Ryan and Molfese had a heated argument on August 19, 2008, which

involved both men yelling and cursing at each other over a charged labor dispute. The evidence did

not establish that Ryan threatened Molfese with physical harm or that he actually struck Molfese.

Therefore, Molfese has not met his burden of proving either the assault or battery claims.

Moreover, the argument between Ryan and Molfese did not rise to the level necessary to

establish a claim for IIED. Ryan and Molfese may have exchanged vulgar and insulting words about

whether or not CSI was unionized and whether Local 13 had a right to picket, but such an argument cannot be said to go beyond "all possible bounds of decency," especially in the context of a job site that is being picketed. At most, it is the type of "insult" and "indignity" that does not qualify as extreme and outrageous conduct. Therefore, Molfese did not meet his burden of proving the IIED claim.

Because Molfese did not meet his burden of proof on his assault, battery, and IIED claims, the court need not address whether the other defendants are vicariously liable for Ryan's conduct.

Accordingly, the court finds in favor of defendants and against Molfese on Count II and Count III of the Complaint.

**CONCLUSION**

In accordance with the foregoing Findings of Fact and Conclusions of Law, the Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiffs on all counts of the complaint. Plaintiffs' motion for attorneys' fees [dkt 125] is denied.


**IT IS SO ORDERED.**

_____
GERALDINE SOAT BROWN
United States Magistrate Judge


DATED: August 30, 2011